Angela TERRY, Plaintiff-Appellant,†

v.

JOURNAL BROADCAST CORPORATION, a
Nevada Corporation, Journal Communications,
Inc., Maureen Mack, John Mercure,
Journal Broadcast Group, Inc., William Berra,
a/k/a Bill Berra, Stephanie Graham,
Paul E. Kritzer, Mark A. Strachota, Sean Briggs,
Paul Balistreri, Gregg Schraufnagel, Executive
Risk Indemnity, Inc. and American International
Speciality Lines Insurance Company,
Defendants-Respondents.

Court of Appeals

*No. 2012AP1682. Submitted on briefs June 4, 2013.
—Decided October 15, 2013.*

2013 WI App 130

(Also reported in 840 N.W.2d 255.)

† Petition for Review denied February 19, 2014.

481

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Gary W. Thompson* of *Thompson Law Offices, S.C.* of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Robert J. Dreps* of *Godfrey & Kahn, S.C.* of Madison.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. KESSLER, J. Angela Terry appeals multiple orders of the circuit court, all stemming from her defamation action against the Journal Broadcast Corporation, its respective insurers, and multiple other parties. We affirm.[1]

## BACKGROUND

¶ 2. Angela Terry is a Milwaukee school bus driver who ran a part-time wedding video service known as "Angie's Wedding Videos." On February 2, 2006, a Milwaukee-area news station, WTMJ-4, aired a broadcast focusing on a couple that had not received their video seven months after the wedding. The couple,

---

[1] On an unrelated note, this court observes that document 47 in the record does not appear to have any relationship to the instant proceedings. We direct that, upon remittitur, the clerk of the circuit court shall ensure that this item is removed from this record and filed appropriately.

Jana and Chad Uebele, contacted the news station and the two were interviewed by the station's investigative reporter, John Mercure.[2]

¶ 3. The Uebeles and another couple, Robin and Ryan Sliga, each paid Terry $1000 in advance of their weddings, but neither couple received their videos within the ten to twelve weeks estimated in Terry's video brochure. The Uebeles received their video approximately seven months after their wedding; the Sligas received their video over a year after their wedding. The news station's broadcast reported the couples' struggles to obtain their videos. We described portions of the broadcast in our previous decision addressing Terry's claims against the Uebeles:

> Mercure . . . interviewed Terry at her home. Clips of the interviews, as well as clips of a confrontation between Mercure and Terry, were made part of an investigative broadcast which aired on February 2, 2006. The segment also contained the following statement from Chad:
>
> "You feel like you're being robbed, and the worst part of it is it's like in plain daylight, it's not like you don't know who it is."
>
> It additionally contained a statement from Mercure indicating that the wedding video was to be provided to the Uebeles within 10 weeks of the wedding.
>
> Following the broadcast, approximately seven months after the Uebeles' wedding, the couple received

---

[2] Terry also filed suit against the Uebeles, alleging libel, slander and negligence. That lawsuit was the subject of a separate appeal, in which we affirmed the circuit court's order granting summary judgment in favor of the Uebeles. *See Terry v. Uebele*, No. 2009AP2381, unpublished slip op. ¶ 1 (WI App Jan. 19, 2011).

their video. The Uebeles were again interviewed by Mercure and WTMJ-4 aired a follow-up broadcast on March 9, 2006, in which the Uebeles expressed their disappointment in the quality of their video. The segment contained the following statements from Jana and Mercure:

"The video she'd showed us and what we got . . . I think that there are some big differences and I guess I was disappointed in some instances where I heard her voice in the background. I really don't want her voice on my wedding video."—Jana.

"[T]he quality [of the video] is well below what they were promised."—Mercure.

A description of the Uebeles experience, as well as Mercure's confrontation with Terry, were posted on Mercure's professional blog. Terry filed suit against the Uebeles, as well as various media defendants, including WTMJ-4, its parent company, Mercure, and various station executives.

*See Terry v. Uebele,* No. 2009AP2381, unpublished slip op. ¶¶ 4–6 (WI App Jan. 19, 2011) (quotation marks added; second set of ellipses and brackets in *Terry*).

¶ 4. The confrontation we addressed in our previous opinion involved portions of Mercure's at-home interview with Terry:

Mercure: When someone pays you a thousand dollars and gives you their baby pictures and signs you up to capture their most precious day and you don't deliver, some people are going to think that's a scam.

Terry: [Makes throat cutting gesture] End of interview. Good bye. Okay, you can leave now.

¶ 5. Terry's son, who was present during the interview, forcibly attempted to remove Mercure from Terry's home, and Terry put her hand in front of the

camera lens. The video portion of this confrontation was broadcast unedited from Terry's throat-cutting gesture until she closed the door on Mercure.

¶ 6. The February 2, 2006 broadcast also featured an interview with Elmer Prenzlow, a consumer affairs specialist with the Department of Agriculture, Trade and Consumer Protection. Based on the Uebeles' complaint to his state office, Prenzlow told viewers he thought the Uebeles had been "ripped off" by Terry:

> I think they absolutely got ripped off. They paid $1,000 for this product. They didn't receive the product they paid for. And that, we think, would be a violation of Wisconsin law.

Prenzlow testified in his deposition that he told Mercure that Terry's legal violation could potentially be civil or criminal.

¶ 7. Following the February 2, 2006 broadcast, Prenzlow received complaints from other customers of Angie's Wedding Videos and required Terry to identify for him all of the customers still waiting for her to complete their wedding videos. Later that month, Terry identified twelve such couples, not counting the Uebeles or Sligas. Prenzlow required Terry to periodically report to him on her progress in completing those videos and kept the State's file on her business open for another year "to make sure that there were no additional violations or complaints." Prenzlow testified he thought the complaints against Terry "could have been referred" for prosecution, but he did not do so because she cooperated with his office.

¶ 8. In March 2006, WTMJ-4 aired a follow-up interview between Mercure and the Uebeles, as well as between Mercure and the Sligas. In that broadcast, Mercure addressed the resolutions of the customer

complaints by stating: "The I-team can expose a problem and consumer protection can take the legal action necessary to get a solution. In this case, they certainly did that."

¶ 9. On January 25, 2008, Terry filed the action underlying this appeal, based on the news stories broadcast in February and March 2006, and the corresponding internet version of those reports. In a Second Amended Complaint, Terry filed numerous causes of action against WTMJ-4, Mercure, Journal Broadcast Corporation, Journal Broadcast Corporation's in-house counsel, and multiple other defendants. As relevant to this appeal, Terry's complaint alleged multiple causes of action based in defamation, all stemming from the reports and the promotional advertisement. The statements and quotations at issue are:

- Mercure's statement in the February 2006 broadcast that the Uebeles "were told [that] their video would be done in 10 weeks."

- Mercure's implication that Terry participated in fraudulent business practices based on the following statements, as taken from Terry's complaint, made in the February 2006 broadcast, a February 2006 Weblog Publication, and the March 2006 broadcast:

 *February 2006 broadcast.*

 Mercure: "Angela Terry was facing criminal charges."

 Mercure: "Newly Weds Ripped Off."

 Mercure: "A Videographer ripped off bride and groom and roughed us up."

 Mercure: "It's a scam."

 Prenzlow: "I think they [the Uebeles] absolutely got ripped off."

492

Mercure: "Problem is, her business is no longer there."

Mercure: "[Y]ou have their baby pictures and they have nothing."

Mercure: "When someone pays you a thousand dollars, gives you their baby pictures and signs you up to capture their most precious day and you don't deliver some people are going to think that's a scam."

Mercure: "You're robbing these people. You're cheating these people."

Prenzlow: "It's an absolutely heartbreaking story. Whenever you see a young couple who is victimized as part of their wedding."

Mercure [to Prenzlow]: "Do you think these consumers got ripped off[?]"

Prenzlow's response: "I think they absolutely got ripped off."

Mercure and anchor Carol Me[e]kins regarding where the Uebeles' pictures and videos were, and Mercure made the statement that: "at this point we really do not know. We don't know for sure if Angie Terry has the video if she has the pictures. She wouldn't answer that question."

### *February 2006 Weblog Publication.*[3]

"Videographer that ripped-off beautiful bride and excited groom."

Mercure: "How is this not a scam?"

"The couple's messages and emails to Angie's office went unanswered."

---

[3] We do not list all of the statements Terry complains of from the weblog publication because many of the statements are repeated from the February broadcast.

"Angie's office is empty."

### *March 2006 follow-up broadcast.*

Mercure: "The I-team can expose a problem and consumer protection can take the legal action necessary to get a solution. In this case, they certainly did that."

- The false implication that Terry is a "freakish and dangerous person that the public should avoid," based on the following statements, images and sounds made either on the promotional advertisement, the broadcasts, or the weblog:[4]

### *Promotional Advertisement.*

Channel-4 "falsely portrayed her as a freakish and dangerous person." The video clip of the teaser promos produced in January 2012 states: "It was their perfect day (pause) until she came along." Video clip shows altered images of Terry, scary music and throat cutting movement.

### *February 2, 2006 Broadcast.*

"[T]hat Angela Terry was facing criminal charges."

"The I-Team's Mercure tracked down the videographer, and that's when he got attacked literally. [T]hat's scary."

"A Videographer ripped off bride and groom and roughed us up."

"You're robbing these people. You're cheating these people."

Broadcasting of the brawl which took place in Terry's home prompted by Mercure's failure to

---

[4] The statements are taken from Terry's complaint.

494

leave when asked and the cameraman brushing/pushing Terry's hand.

The story contained Mercure's statement directed to Terry "Get your [bleep] hands off me. You better get your [bleep] hands off me. You don't touch me."

***February 3, 2006 – Weblog Publication.***

Title – "When Angie Attacks[.]"

***March 9, 2006 Broadcast.***

Mercure: "The I-team can expose a problem and consumer protection can take the legal action necessary to get a solution. In this case, they certainly did that."

(Some formatting altered; some capitalization omitted; some punctuation altered.)

¶ 10. The circuit court granted the Uebeles' motion for summary judgment—a ruling we affirmed.[5] Following remittitur, multiple motions were made. The circuit court denied Terry's motion for additional discovery, in which she sought video clips of the promotional advertisement the news station used to promote the February 2006 broadcast. Terry also sought to depose the news station's in-house counsel, Paul Kritzer. The circuit court denied the motion. Terry also filed a motion for summary judgment arguing libel *per se*. On January 12, 2012, the news station provided Terry with the promotional advertisement clips she sought. Terry moved to amend the pleadings to conform to the evidence. The circuit court denied the motion. Finally, in a thoughtful, well-reasoned decision, the circuit court granted summary judgment in favor of the

---

[5] The Uebeles' motion for summary judgment was decided by the Honorable Dennis P. Moroney.

news station and the multiple other media defendants, denied Terry's libel *per se* summary judgment motion, and thereby dismissed all of Terry's claims. The circuit court concluded that there was no basis for any of Terry's claims because all of the statements at issue were either opinions or were substantially true.

¶ 11. Terry now appeals multiple decisions of the circuit court. First, Terry appeals the circuit court's summary judgment order in favor of the media defendants dismissing all of her claims. She also appeals the circuit court's denial of: (1) summary judgment on her libel *per se* claim; (2) her motion to amend the pleadings; (3) her motion to compel the deposition of Kritzer; and (4) her independent causes of action in negligent and intentional infliction of emotional distress. We address each argument in turn. Additional facts are included as relevant to the discussion.

## DISCUSSION

### I. Summary Judgment in Favor of the Media Defendants.

¶ 12. Terry argues that the circuit court erroneously granted summary judgment for the media defendants for a multitude of reasons. She contends that: (1) material facts are in dispute; (2) statements and images from the broadcasts, promotional advertisements and the web blog were defamatory; (3) the circuit court erroneously dismissed her misappropriation and invasion of privacy claims; and (4) the circuit court adopted "an adverse competing inference to an admittedly false statement." (Some capitalization omitted.) We disagree.

## A. Standard of Review.

■

¶ 13. "Summary judgment is appropriate to determine whether there are any disputed factual issues for trial and to avoid trials where there is nothing to try." *Bay View Packing Co. v. Taff*, 198 Wis. 2d 653, 672, 543 N.W.2d 522 (Ct. App. 1995) (quotation marks and citation omitted). In matters concerning the law of defamation, we have explained the summary judgment standard as follows:

> Summary judgment may be particularly appropriate in defamation actions in order to mitigate the potential "chilling effect" on free speech and the press that might result from lengthy and expensive litigation. While we apply the same methodology as the trial court when reviewing a summary judgment motion, we owe no deference to the conclusion of the trial court. Indeed, the United States Supreme Court has declared that in defamation cases "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.' " As such, we first examine the pleadings to determine whether they state a claim for relief. If the pleadings state a claim and the responsive pleadings join the issue, we then must examine the evidentiary record to analyze whether a genuine issue of material fact exists or whether the moving party is entitled to a judgment as a matter of law. Further, "[o]n summary judgment, we must draw all justifiable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence."

*Id.*, at 672–73 (internal citations, quoted sources and footnote omitted; brackets in *Bay View Packing*).

¶ 14. "The elements of a defamatory communication are: (1) a false statement, (2) communicated by speech, conduct, or in writing to a person other than the person defamed, and (3) the communication is unprivileged and is defamatory, that is, tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her." *Mach v. Allison*, 2003 WI App 11, ¶ 12, 259 Wis. 2d 686, 656 N.W.2d 766 (Ct. App. 2002). "The 'statement' that is the subject of a defamation action need not be a direct affirmation, but may also be an implication." *Id.* "In a defamation action brought by a private figure against a media defendant, the plaintiff has the burden of proving that the speech at issue is false; this requirement is imposed in order to avoid the chilling effect that would be 'antithetical to the First Amendment's protection of true speech on matters of public concern.' " *Id.*, ¶ 13 (citation omitted). "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable *only if* it implies the allegation of *undisclosed* defamatory facts as the basis for the opinion." RESTATEMENT (SECOND) OF TORTS § 566 (emphasis added). "The principle of 'fair comment' afford[s] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990) (quotation marks and citation omitted).

## B. Material Facts in Dispute.

¶ 15. Terry argues that genuine issues of material fact exist as to two statements: (1) an allegation made

by Mercure during the February 2, 2006 broadcast that Terry "was facing criminal charges"; and (2) a statement by Mercure during the same broadcast that the Uebeles "were told [that] their video would be done in 10 weeks." Neither statement presents a genuine issue of material fact.

■

¶ 16. First, the statement that Terry "was facing criminal charges" was substantially true. *See Lathan v. Journal Co.*, 30 Wis. 2d 146, 158, 140 N.W.2d 417 (1966) (It is not "necessary that the article or statement in question be true in every particular. All that is required is that the statement be substantially true."). Prenzlow, a consumer affairs specialist employed by the State of Wisconsin, testified that Terry's conduct could potentially constitute a violation of Wisconsin consumer and criminal laws. Prenzlow stated that he did not refer Terry to the District Attorney's Office because after the February 2, 2006 broadcast, she cooperated with the Department of Agriculture, Trade and Consumer Protection and the issues between Terry and her customers were successfully mediated. We disagree with Terry that the term "facing criminal charges" necessarily implied that she was actually criminally charged. None of the broadcasts or corresponding internet stories stated that Terry was actually charged with a crime. In the context of the broadcast and Prenzlow's statements, it is clear that "facing criminal charges" meant that Terry *could potentially* be charged for the failure to provide paying couples with their wedding videos, which was true. There is no issue of material fact as to this statement.

■

¶ 17. Terry also contends that Mercure's statement indicating that the Uebeles "were told [that] their

video would be done in 10 weeks" presents an issue of material fact because "the undisputed fact is that Terry represented to her customers and in her wedding brochure" that the ten to twelve week completion time frame was an estimate. We have already addressed this issue in *Terry*, No. 2009AP2381, unpublished slip op. ¶ 18, when we stated:

> That Mercure did not clarify the timeframe was an estimate or that it was ten to twelve weeks, rather than just ten, does not undermine the substantial truth of the statement. It is not disputed that the Uebeles were provided with a general timeframe but received their video approximately seven months after their wedding. The statement therefore cannot be proven false[.]

Therefore, there is no issue of material fact regarding Mercure's statement as to the timeframe of the Uebeles' video completion.

## C. Defamatory Statements.

¶ 18. Terry also argues that numerous statements made either during the February 2, 2006 broadcast, the promotional advertisement for the broadcast, the March 9, 2006 broadcast, or on the news station's website, were defamatory. We disagree.

¶ 19. A statement is defamatory if it " 'tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.' " *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534, 563 N.W.2d 472 (1997) (citation omitted). "A person who claims that his or her reputation has been unlawfully damaged by something someone else has said *must first establish that the words are not true and are capable of*

*a defamatory meaning." Freer v. M & I Marshall & Ilsley Corp.,* 2004 WI App 201, ¶ 8, 276 Wis. 2d 721, 688 N.W.2d 756 (emphasis added). " 'In determining whether language is defamatory, the words . . . must be construed in the plain and popular sense in which they would naturally be understood.' " *Maguire v. Journal Sentinel, Inc.,* 232 Wis. 2d 236, 249, 605 N.W.2d 881 (Ct. App. 1999) (citation omitted; ellipses in *Maguire*). The context and circumstances in which the statements were made are also to be considered. *Frinzi v. Hanson,* 30 Wis. 2d 271, 276, 140 N.W.2d 259 (1966). It is not "necessary that the article or statement in question be true in every particular. All that is required is that the statement be substantially true." *Lathan,* 30 Wis. 2d at 158.

¶ 20. Terry points to a long list of allegedly defamatory statements and images which she contends led to the false implications that she was engaged in fraudulent business practices and that she was a "freakish and dangerous person that the public should avoid." (Capitalization omitted.) We address both allegations.

## 1. Fraudulent Business Practices.

¶ 21. Terry argues that the following statements, taken either from the broadcasts, the promotional advertisement, or the corresponding website, implied that she engaged in fraudulent business practices:

**February 2, 2006 Broadcast**.

Mercure: "Angela Terry was facing criminal charges."

Mercure: "Newly Weds Ripped Off."

Mercure: "A Videographer ripped off bride and groom and roughed us up."

Mercure: "It's a scam[.]"

Prenzlow: "I think they [the Uebeles] absolutely got ripped off."

Mercure: "Problem is, her business is no longer there[.]"

Mercure: "[Y]ou have their baby pictures and they have nothing[.]"

Mercure: "When someone pays you a thousand dollars, gives you their baby pictures and signs you up to capture their most precious day and you don't deliver some people are going to think that's a scam[.]"

Mercure: "You're robbing these people. You're cheating these people."

Prenzlow: "It's an absolutely heartbreaking story. Whenever you see a young couple who is victimized as part of their wedding[.]"

Mercure [to Prenzlow]: "Do you think these consumers got ripped off[?]"

Prenzlow's response: "I think they absolutely got ripped off."

Mercure to anchor Carol Me[e]kins regarding where the Uebeles' pictures and videos were: "[A]t this point we really do not know. We don't know for sure if Angie Terry has the video if she has the pictures. She wouldn't answer that question."

### *February 3, 2006 Weblog Publication.*

"Videographer that ripped-off beautiful bride and excited groom."

Mercure: "How is this not a scam[?]"

"The couple's messages and emails to Angie's office went unanswered."

"Angie's office is empty."

*March 2006, follow-up broadcast.*

Mercure: "The I-team can expose a problem and con-
sumer protection can take the legal action necessary to
get a solution. In this case, they certainly did that."

¶ 22. We have already addressed the statement
that Terry "was facing criminal charges" and have con-
cluded that the statement was substantially true. It is
well-settled law that "[t]ruth is an absolute defense to a
defamation claim. It is not necessary that the 'statement
in question be true in every particular. All that is
required is that the statement be substantially true.'"
*Anderson v. Hebert*, 2011 WI App 56, ¶ 14, 332 Wis. 2d
432, 798 N.W.2d 275 (quoted source and internal citation
omitted). For the same reasons, Mercure's statement
that "[t]he I-team can expose a problem and consumer
protection can take the legal action necessary to get a
solution. In this case, they certainly did that[,]" is also
not actionable. The news station did contact a consumer
protection agent. The agent indicated that Terry's action
were potentially legally actionable, and then worked
with Terry to ensure that her customers received their
products. Mercure's statement, therefore, was substan-
tially true. With regard to the remaining statements, we
agree with the circuit court that they are either state-
ments of opinion, or are substantially true.

¶ 23. A majority of the statements Terry com-
plains about use some variation of the terms "rob,"
"ripped off," "cheat," "victim" or "scam." The media
defendants maintain that these statements are opin-
ions based in fact, and are therefore not actionable. We
agree that all of these terms, in the context in which they
were used, convey statements of opinion that are not

defamatory. *See Milkovich*, 497 U.S. at 13 ("The principle of 'fair comment' afford[s] legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact.") (one set of quotation marks and citation omitted). Although opinions are not completely exempt from the realm of defamatory communications, an actionable opinion must be blended with an expression of fact and must imply " 'the assertion of undisclosed defamatory facts as a basis of the opinion.' " *Milsap v. Journal/ Sentinel, Inc.*, 100 F.3d 1265, 1268 (7th Cir. 1996) (citation omitted). The use of these terms all stemmed from the fundamental fact that Terry did not deliver a product within the time the purchasers believed it was promised despite paying for it. That Terry did not give the Uebeles their video until seven months after their wedding is not in dispute. That Terry did not give the Sligas their video until thirteen months after their wedding is also not in dispute. Although Terry provides us with dictionary definitions of all of the words she challenges, all of which she claims imply criminal behavior, we note that "[w]hile some connotations of [a] word may encompass criminal behavior, others do not." *See McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987). In the context of the entire news broadcast, advertisement and web story, all of which detailed the struggles the couples went through to obtain videos they paid for but had not received, the terms Terry complains of are not actionable. A reasonable viewer or reader of these media stories would not take the terms to convey anything other than what the stories reported: local couples paid in advance for wedding videos that they did not receive until months after their weddings. The same rationale applies to Mercure's statements regarding Terry's possession of the couples' baby pictures—the statements were substantially true. Terry

did have the pictures while the couples did not have their videos. The statements are not actionable. *See Milkovich*, 497 U.S. at 20 ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.").

¶ 24. With regard to the statement that Terry's business "is no longer there[,]" we agree with the circuit court that the news station promptly corrected itself within the same broadcast. In the actual broadcast, Mercure went to Terry's place of business, but Terry was not present, prompting the statement "[p]roblem is, her business is no longer there." The corresponding internet story reported that "Angie's office is empty." Almost immediately after stating that Terry's business was "no longer there[,]" however, Mercure appeared at Terry's Milwaukee-area home to interview her. The broadcast revealed that: (1) Terry did, indeed, still live in Milwaukee; (2) Terry did not take money from multiple couples and leave town; and (3) Terry was still working on the videos for the couples she owed, thereby implying that she was still in business. The statement on the web story that "Angie's office is empty" was true—at the time Mercure and his crew went to Angie's office, she was not present. Neither of these statements is defamatory.

## 2. Implication that Terry is a "freakish and dangerous person."

¶ 25. Terry argues that the following broadcast statements, images and sounds, support her argument that she was portrayed as a "freakish and dangerous person":

505

***Promotional Advertisement.***

Channel-4 "falsely portrayed her as a freakish and dangerous person." The video clip of the teaser promos produced in January 2012 states: "It was their perfect day (pause) until she came along." Video clip shows altered images of Terry, scary music and throat cutting movement.

***February 2, 2006 Broadcast.***

"[T]hat Angela Terry was facing criminal charges."

"The I-Team's Mercure tracked down the videographer, and that's when he got attacked literally. [T]hat' s scary."

"A Videographer ripped off bride and groom and roughed us up."

"You're robbing these people. You're cheating these people."

Broadcasting of the brawl which took place in Terry's home prompted by Mercure's failure to leave when asked and the cameraman brushing/pushing Terry's hand.

Mercure's statement directed to Terry "Get your [bleep] hands off me. You better get your [bleep] hands off me. You don't touch me."

***February 3, 2006 – Weblog Publication.***

Title – "When Angie Attacks[.]"

***March 9, 2006 Broadcast.***

Mercure: "The I-team can expose a problem and consumer protection can take the legal action necessary to get a solution. In this case, they certainly did that."

(Some formatting and punctuation from the complaint altered.)

506

¶ 26. With regard to the statements and images concerning the "brawl" Terry describes, we conclude that Terry fails to show how they are defamatory.[6] In essence, Terry is challenging the way in which she was portrayed in so far as the music and video edits are concerned, but she does not have a cause of action for the words that were used to portray her. None of the videos or web stories Terry challenges use the term "freakish and dangerous person." *See* Wis. Stat. § 802.03(6) (2011–12)[7] (requiring parties alleging libel or slander to state "the particular words complained of" in the complaint). The video shows an incident—Terry's son attempting to forcibly remove Mercure from Terry's home—and Mercure's and Terry's reactions to the incident. Corresponding statements were used to describe the incident. As stated, "truth is an absolute defense" in defamation actions. *Denny v. Mertz,* 106 Wis. 2d 636, 643, 318 N.W.2d 141 (1982). Terry cannot maintain a defamation action for how she *feels* she was portrayed. None of the specific spoken or written words present causes of action in defamation.

## D. Misappropriation and Invasion of Privacy.

¶ 27. Terry also argues that the circuit court erroneously dismissed her misappropriation and invasion of privacy claims. Terry argues that her image was misappropriated, contrary to Wis. Stat. § 968.31(1), because the news station used an image of Terry making a "throat cutting" gesture when it "was taken in

---

[6] We have already addressed many of the statements Terry complains of in this section and decline to do so again.

[7] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

her home without her consent." She also contends that the news station violated WIS. STAT. § 995.50, the invasion of privacy statute, when it continued to film inside her home after she declared the interview over. We disagree with both claims.

## 1. Misappropriation.

■■■■■■

¶ 28. Terry contends that pursuant to WIS. STAT. § 968.31, the wiretap statute,[8] her image was misappropriated because she was recorded without her consent. The circuit court dismissed this claim, finding it inadequately pled. Terry's complaint neither cites to § 968.31, nor makes any claims pertaining to intercepted communications. Section 968.31, at its core, addresses surreptitious interception and subsequent disclosure of wire, electronic or oral communications. To the extent Terry argues that communications between the news station and herself were intercepted, we conclude that her complaint does not adequately address this issue. Even if Terry had adequately pled a violation of § 968.31, however, we conclude that the record does not support her claims. The undisputed facts demonstrate that there were no "oral communications" to intercept. WISCONSIN STAT. § 968.27(12) defines oral communication as: "any oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying the expectation." Terry allowed the news crew into her home, was aware at all times the camera was rolling and knew that her interaction with Mercure was being recorded. Terry had no

---

[8] Terry does not specify which specific section of WIS. STAT. § 968.31 she believes the media defendants violated.

reasonable expectation that her statements were "not subject to interception"—the camera was rolling as she pushed Mercure and his crew out of her home. The same rationale holds true for Terry's argument that the station broadcast her image without her consent.

## 2. Invasion of Privacy.

¶ 29. Terry contends that the circuit court erroneously dismissed her invasion of privacy claim because she argues that the news station violated WIS. STAT. § 995.50[9] when it continued to film her after she said "end of interview." Terry argues that the news station went on to use her wrongfully obtained image for advertising purposes. Again, Terry did not adequately plead the elements of an invasion of privacy claim. Rather, as the circuit court noted, Terry's invasion of privacy claim is "more of an attempt to impose the false light provision . . . false light is not part of our invasion of privacy law." Moreover, under the facts of this case, a

---

[9] WISCONSIN STAT. § 995.50, as relevant, provides:

**Right of privacy. (1)** The right of privacy is recognized in this state . . . .

. . . .

**(2)** In this section, "invasion of privacy" means any of the following:

(a) Intrusion upon the privacy of another of a nature highly offensive to a reasonable person, in a place that a reasonable person would consider private or in a manner which is actionable for trespass.

(b) The use, for advertising purposes or for purposes of trade, of the name, portrait or picture of any living person, without having first obtained the written consent of the person or, if the person is a minor, of his or her parent or guardian.

. . . .

party's nonperformance of a paid-for service led to an investigative news report. Mercure's interview with Terry, though contentious, served a legitimate public interest—consumer affairs reporting where the consumers had arguably been treated unfairly. After the interview initially aired, twelve other couples came forward with complaints against Terry. We decline to conclude that a reporter's interview with the accused party constitutes an invasion of privacy under § 995.50.

## E. Adverse Competing Inference.

¶ 30. Terry also contends that the circuit court erroneously granted summary judgment for the media defendants because the court adopted "an adverse competing inference to an admittedly false statement" when it found Mercure's statement "[p]roblem is, her business is no longer there[,]" to be inaccurate, but still granted summary judgment in the media defendants' favor. We have already concluded that this statement is not defamatory because, though inaccurate, it was immediately rectified within the same broadcast. The competing inference Terry argues—that she engaged in a fraudulent business—was resolved by Mercure's interview with Terry in her home, which confirmed that Terry did not leave town with her customer's money, was still living in Milwaukee, and was still actively engaged in her business. In considering the broadcast as a whole, " 'not in detached fragments,' " it is clear that the circuit court did not adopt an adverse competing inference. *See Mach*, 259 Wis. 2d 686, ¶ 31 (citation omitted).

## II. Libel *Per Se*.

¶ 31. Terry argues that the circuit court erroneously denied her motion for summary judgment on the

issue of libel *per se*. Terry contends that Mercure's statement during the February 2, 2006 broadcast "you're robbing these people, you're cheating these people," constitutes libel *per se* because, she contends, it accused her of committing a crime. We disagree.

¶ 32.　In *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 460, 113 N.W.2d 135 (1962), our supreme court explained the theory of "libel per se." The court stated that:

> [l]ibel per se and slander per se have been used to mean actionable per se and sometimes confused with it. The distinction between defamation, which is actionable by itself, or per se, and that which requires proof of special damages is not the same as the distinction between language which may be defamatory on its face or may convey a defamatory meaning only by reason of extrinsic circumstances.

*Id.* The court clarified that "all libels are actionable without alleging or proving special damages," but stated that "[i]t is the function of the court to determine in the first instance whether a communication published in the form of libel or slander is capable of a defamatory meaning." *Id.* at 461.

¶ 33.　Here, we have already concluded that the phrase "you're robbing these people, you're cheating these people," in this context is not capable of defamatory meaning. Although Terry provides us with dictionary definitions of the terms "rob" and "cheat," we conclude that "[w]hile some connotations of the word may encompass criminal behavior, others do not." *See McCabe*, 814 F.2d at 842. Examining the statements in the context of the entire broadcast makes it clear that Mercure's statement did not imply criminal behavior. The broadcast accurately described the Uebeles' char-

acterization of their experience with Terry and formed the basis of Mercure's statement. Mercure's statement was one of opinion and did not constitute libel *per se.*

## III. Motion to Amend the Pleadings.

¶ 34. Terry contends that the circuit court erroneously denied her motion to amend the pleadings "to conform to the evidence" pursuant to WIS. STAT. § 802.09(2). Terry's motion concerned the video recording of the promotional advertisement, which the news station did not produce to Terry's counsel until January 12, 2012. Terry sought leave to plead the exact content of the promotional video. The circuit court denied the motion, finding that her proposed amendment would add nothing to her claim because Terry had a script of the promotional advertisement, which she obtained in 2008.

¶ 35. The circuit court has wide discretion regarding amendment of pleadings and will not be reversed absent an erroneous exercise of discretion. *Wiegel v. Sentry Indem. Co.*, 94 Wis. 2d 172, 184, 287 N.W.2d 796 (1980). "However, the standard contemplates that the discretion will be exercised and that the basis for the court's reasoning will be set forth in the record." *United States Fire Ins. Co. v. E. D. Wesley Co.*, 100 Wis. 2d 59, 63, 301 N.W.2d 271 (Ct. App. 1980), *modified,* 105 Wis. 2d 305, 313 N.W.2d 833 (1982). Both events occurred here.

¶ 36. WISCONSIN STAT. § 802.09(2) allows amendments to conform to the evidence "[i]f issues not raised by the pleadings are tried by express or implied consent

of the parties." We held in *Thom v. OneBeacon Ins. Co.*, 2007 WI App 123, ¶ 25, 300 Wis. 2d 607, 731 N.W.2d 657, that the statute allows for amendments to pleadings if certain issues are *tried*, though not raised by the pleadings. ("There was no trial in this case, only arbitration. [The party] provides no authority indicating the term 'tried' in the statute refers to anything but a trial."). Similarly, there was no trial in this case. Terry's claims were dismissed on summary judgment. Moreover, the circuit court stated its reasons for denying Terry's motion on the record—the court recognized that allowing Terry to amend the pleadings in litigation which had been pending for multiple years would add nothing to her claim. Although Terry claims there are differences between the script she received in 2008 and the video she received in 2012, there are no material differences. The statement Terry sought to add to her pleadings appears in both scripts. The circuit court did not erroneously exercise its discretion.

## IV. Terry's Motion to Compel the Deposition of the News Station's In-House Counsel.

¶ 37. Terry contends that the circuit court erroneously denied her motion to compel the deposition of Kritzer. Terry argues that communications between Mercure and Kritzer regarding approval of broadcast scripts were subject to the crime-fraud exception to attorney-client privilege.[10] The basis of Terry's motion was her contention that Mercure engaged in purposeful

---

[10] WISCONSIN STAT. § 905.03(4)(a) provides an exception to the general rule of attorney-client privilege if "the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."

conduct intended to destroy Terry's reputation, and that Kritzer "green light[ed]" Mercure's conduct by approving Mercure's use of the phrase "you're robbing these people, you're cheating these people." We have held in this opinion that the phrase Terry complains of is not defamatory. As such, it could not support the crime-fraud exception to attorney-client privilege.

## V. Negligent and Intentional Infliction of Emotional Distress.

¶ 38. A claim for negligent infliction of emotional distress contains three elements: "(1) that the defendant's conduct fell below the applicable standard of care, (2) that the plaintiff suffered an injury, and (3) that the defendant's conduct was a cause-in-fact of the plaintiff's injury." *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 632, 517 N.W.2d 432 (1994). Additionally, "a plaintiff must prove . . . severe emotional distress; but the plaintiff need not prove physical manifestation of that distress." *Id.*

¶ 39. Terry contends that the circuit court erroneously dismissed her claims of negligent and intentional infliction of emotional distress, which Terry argues were independent of her defamation claims. Terry alleges that the news station's false broadcast and Mercure's conduct resulted in the loss of her wedding video business, which in turn led to severe depression and suicidal ideations.

¶ 40. The circuit court dismissed Terry's claims, finding that they were derivative of her defamation claims. In her brief-in-chief, Terry states: "Terry's emotional distress claims should be recognized to have

arisen . . . separately and independently from the physical confrontation and verbal epithets spoken by Mercure in Terry's home." Terry's complaint states that her negligent and intentional infliction of emotional distress claims rest on the news station's "duty not to broadcast or publish false and/or inaccurate statements about the plaintiff." Because Terry's complaint does not address the "physical confrontation and verbal epithets spoken by Mercure in Terry's home," we do not address these issues on appeal. *See State v. Dowdy*, 2012 WI 12, ¶ 5, 338 Wis. 2d 565, 808 N.W.2d 691 (issues not raised or considered in the trial court will not be considered for the first time on appeal).

¶ 41. Because the contents of the broadcast were not false or defamatory, Terry cannot prove that the media defendants violated any standard of care. Accordingly, Terry does not have a claim for negligent infliction of emotional distress. The circuit court correctly granted summary judgment on this claim.

■■■■■

¶ 42. Similarly, Terry cannot prove the elements of a claim for intentional infliction of emotional distress. Such a claim requires a showing of four elements: (1) the defendant intended to cause emotional distress by his or her conduct; (2) that the conduct was extreme and outrageous; (3) that the "conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling response to the defendant's conduct." *Rabideau v. City of Racine*, 2001 WI 57, ¶ 33, 243 Wis. 2d 486, 627 N.W.2d 795. Again, the lynchpin of Terry's claim—falsity—is missing. Accordingly, we cannot conclude that the media defendants engaged in "extreme and outrageous" conduct.

## CONCLUSION

¶ 43. For the foregoing reasons, we affirm the circuit court on all grounds. To the extent Terry raised issues not addressed by this opinion, we conclude that our decision on the numerous issues set forth here resolves all other issues argued by Terry.

*By the Court.*—Orders affirmed.